# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00343-CR

**Cesar Carmona Mojica, Sr., Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF HAYS COUNTY, 22ND JUDICIAL DISTRICT
### NO. CR-07-027, HONORABLE JACK H. ROBISON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Cesar Carmona Mojica, Sr., guilty of fourteen counts of knowingly causing serious bodily injury to a child. *See* Tex. Penal Code Ann. § 22.04(a)(1), (e) (West Supp. 2008). The jury assessed punishment for each count at imprisonment for life. Appellant contends that the trial court erred by overruling his motion to suppress his statement to the police, by allowing an unfairly prejudicial demonstration during the trial, by allowing a witness to testify to the contents of hospital records without the required predicate, and by failing to grant a mistrial when a State witness gave a news interview following his testimony. We overrule these contentions and affirm the judgments of conviction.

# BACKGROUND

The complainants were appellant's three children: twins AmM and CM and their older sister, AnM. In October 2006 when the children were taken from the home by child protective services workers, AmM and CM were two years and nine months old, and AnM was three-and-a-half years old. There was testimony that none of the children had been to a hospital or seen a doctor since their birth.

The medical evidence showed that AmM had fifty-six documented injuries, including "multiple skin lesions almost all over her," several of which were bite marks. She had seven fractured ribs, one of which had been broken in three places, four broken bones in her hands, and both of her femurs had been fractured. AmM weighed only nineteen pounds, and she had diminished muscle mass and brain atrophy resulting from acute and chronic malnutrition. She was not verbal and could not or would not walk.

CM had fifty-seven documented injuries. Like his twin sister, CM had "lesions that appeared to be bite marks, and there were multiple other scratches and scars and so on." In addition, he "had patterned bruising that appeared to have been caused by some kind of a looped cord or whip or some kind of object. And those lesions were very striking." CM had two broken ribs, three broken fingers, two fractures in his left foot, and a fractured femur. CM was not as seriously malnourished as AmM, but he also had diminished muscle mass and weighed only twenty-two pounds. He, too, was non-verbal and could not or would not walk.

AnM had twenty-eight documented injuries, including lacerations in her mouth and a missing tooth. She had bite marks on her abdomen, back, arms, legs, and buttocks. AnM did not

2

have any skeletal injuries, and her nutritional status was much better than that of her younger siblings.

Both in his statement to the police following his arrest and in his trial testimony, appellant admitted striking and biting the children, but he denied knowing or remembering how their ribs, fingers, and legs had been fractured. Appellant attributed his poor memory of events to the fact that he was intoxicated much of the time. Appellant also testified that he was physically abused as a child, and he explained his treatment of his own children as "the way I was raised. I thought it was the right thing. And now I know I wasn't doing the right thing." A defense psychologist conducted a "culpability analysis" and testified that, in his opinion, appellant had not knowingly injured his children, but had instead acted recklessly or negligently.

## DISCUSSION

*Motion to Suppress*

Appellant gave a video-recorded oral statement to the police following his arrest.[1] He contends that the statement should have been suppressed because he was not advised of his rights in compliance with *Miranda* and article 38.22. *Miranda v. Arizona*, 384 U.S. 436, 467-73 (1966);

---

[1] The video was introduced in evidence (State's exhibit 118) but not shown to the jury, presumably because the interview was conducted in Spanish. Two Spanish-to-English transcriptions of the interview were introduced in evidence at the guilt stage (State's exhibits 119 and 209). These transcriptions are identical except that certain references to extraneous matters were redacted from exhibit 209. The unredacted transcription was introduced again at the punishment stage (State's exhibit 274). The transcriptions introduced at trial differ slightly from the transcription introduced at the pretrial suppression hearing (State's pretrial exhibit 2). The primary difference is that in the trial exhibits, the interpreter added the notations "NVD" (non-verbal denial) and "NVA" (non-verbal agreement) where appropriate to indicate appellant shaking or nodding his head. In this opinion, all quotations from the interview are taken from the transcription introduced at trial.

3

Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a)(2) (West 2005). Appellant also contends that the police continued to interrogate him after he requested counsel. *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

A trial court's ruling on a motion to suppress is reviewed for an abuse of discretion. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). This means that the ruling will be upheld if it is reasonably supported by the record and is correct under any applicable legal theory. *Id*. The trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give the trial court almost complete deference in determining historical facts, but we review de novo the trial court's application of the law to those facts. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).

The State contends that appellant did not preserve his contentions for review. First, the State argues that appellant waived any complaints regarding the admission of the statement by testifying at trial and admitting his guilt. The only authority cited by the State is a court of appeals opinion applying the "*DeGarmo* doctrine." *See Taylor v. State*, 819 S.W.2d 248, 249 (Tex. App.—Waco 1991, no pet.); *see also DeGarmo v. State*, 691 S.W.2d 657, 660-61 (Tex. Crim. App. 1985). This doctrine has been largely disavowed by the court of criminal appeals. *See Leday v. State*, 983 S.W.2d 713, 720-26 (Tex. Crim. App. 1998). A defendant's admission of guilt at trial does not estop him from contending on appeal that his custodial statement was inadmissible. *Id*. at 725.

Alternatively, the State complains that appellant's trial objection did not mention *Miranda* or article 38.22, but cited only the Fifth and Sixth Amendments. The objection to which the State refers, however, was not directed to the admission of appellant's statement. Moreover, *Miranda* and *Edwards* are Fifth Amendment opinions. *See Miranda*, 384 U.S. at 467-73; *Edwards*, 451 U.S. at 480.[2] Finally, the contentions appellant now makes were raised at the pretrial suppression hearing and overruled by the trial court. *See* Tex. R. Evid. 103(a)(1). Appellant's contentions were preserved.

Following appellant's arrest, San Marcos police detective Adrian Marin was assigned to interview him because the officer is bilingual.[3] The transcription of the interview reflects that after entering the interview room and introducing himself, Marin asked appellant a few preliminary questions in English, to which appellant responded in English. Marin then asked appellant if he would prefer to be advised of his rights in Spanish or English. Appellant chose Spanish. From that point forward, the interview was conducted in Spanish.

Marin advised appellant of his rights by reading from a Spanish-language admonishment and waiver of rights form then in use by the San Marcos police. It is undisputed that this document was not a wholly accurate translation into Spanish of the admonishments required by

---

[2] In his brief, appellant erroneously states that *Miranda* and *Edwards* were based on the Sixth Amendment.

[3] Appellant was born in Mexico and moved to the United States when he was twelve years old. He was twenty-two years old at the time of his arrest. The record reflects that appellant speaks and understands English. He expressly declined the services of a translator at his trial, and he testified in English.

*Miranda* and article 38.22. According to a translation into English that both parties agree is accurate, the form advised appellant of his rights as follows:

• You have the right to remain silent and to say nothing and any statement that you make may be used against you in your trial.

• Any statements spoken or written that you make may be used as evidence against you in court.

• You have the right to have your attorney present to notify you before and during questions of a policeman or of lawyers representing the state.

• If you are too poor to obtain the services of an attorney then the court will point one out to you free of service and he may give you advise before and during questions.

• You may decide to talk to whoever you want and you may decide to stop talking with it at any time.

• These rights are continued and may be urgently pressed by you at any time you so wish.

Appellant argues that the fourth admonishment, that "the court will point [an attorney] out to you free of service," did not adequately convey the information that, if appellant were unable to afford an attorney, one would be appointed to represent him. Appellant contends that as a result, he did not knowingly waive his right to appointed counsel during questioning.

The Spanish-to-English transcription of the recorded interview reflects that as Marin was advising appellant of his right to have counsel present during questioning, appellant interrupted to ask, "But I don't have money?" Marin responded, "Wait, wait, OK?" After completing the third admonishment and confirming appellant's understanding of his right to have a lawyer present, Marin,

6

referring to the fourth admonishment, told appellant, "What does it say? Read it for me."[4] Appellant replied, "What it says is that if you're too poor to obtain the services of a lawyer . . . then the court will point you a free lawyer of service and he can give advice before and during questions." Appellant added, "That means that you can give me the lawyer . . . because I don't have money." Marin responded, "And that is the question that you . . . asked me, right?" Appellant answered, "Yes." Marin asked, "OK. Do you still have questions or not?" Appellant answered, "No."

In overruling appellant's motion to suppress, the trial court acknowledged that "it [the admonishment form] may not be a perfect translation." But the court continued, "[T]he places that have been pointed out where it is not exactly right, if you listen to the conversation afterwards between the two in the colloquy, it is clear to me that the defendant did understand what rights he was waiving and made a voluntary waiver."

Appellant did not testify at the suppression hearing, and whether he fully understood his rights must be deduced from his words and actions at the time he gave his statement. With respect to his right to appointed counsel, the transcription confirms that appellant understood that "you can give me the lawyer . . . because I don't have money." The trial court did not abuse its discretion by concluding that, when appellant waived his right to counsel during questioning, he did so with the understanding that counsel would be appointed for him if he wished.

Appellant also contends that he asked for counsel, but Marin did not honor this request and continued his questioning. When a suspect asserts his right to counsel, all interrogation

---

[4] Marin testified, and the transcription confirms, that appellant was reading the admonishments as Marin read them to him.

must cease until counsel is provided or until the suspect personally reinitiates the conversation. *Edwards*, 451 U.S. at 484-85; *Dinkins v. State*, 894 S.W.2d 330, 350 (Tex. Crim. App. 1995). A suspect's request for counsel during questioning must be clear and unambiguous. *Davis v. United States*, 512 U.S. 452, 459 (1994). Whether the mention of a lawyer constitutes a clear invocation of the right to counsel will depend on the statement itself and the totality of the surrounding circumstances. *Id.* at 461-62. The suspect must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. *Id.* at 458-59.

The record shows that after advising appellant of his rights, Marin read the waiver of rights to appellant and showed him where to sign. This exchange followed, as shown in the Spanish-to-English transcription:

> [Appellant:] Then, if, if I sign that, I'm renouncing all of these?
>
> [Marin:] Yes . . . .
>
> . . .
>
> [Appellant:] If I also don't want to give up the service of the lawyer?
>
> [Marin:] Pardon me?
>
> [Appellant:] I don't want to give up the service of the lawyer.
>
> [Marin:] Then you want your lawyer present here?
>
> [Appellant:] Not right now. But for court and all that.
>
> [Marin:] Yes, they can give you a lawyer. . . . This only says that I want to talk to you without your lawyer present. Do you understand?

[Appellant:] Oh, OK. . . .

. . .

[Appellant:] But, I still keep on having my rights with a lawyer?

[Marin:] You have your rights.

[Appellant:] Just that those rights, right now, just here with us?

[Marin:] Yes. Those are continued.

[Appellant:] OK. [NVA]

. . .

[Marin:] But I want to talk to you without your lawyer.

[Appellant:] OK. [NVA]

[Marin:] Do you understand?

[Appellant:] Yeah. [NVA]

[Marin:] OK. And you're fine with that or, or do you want your lawyer present? It's, we need to make it very clear here.

[Appellant:] And is there a lawyer right now?

[Marin:] No, right now there's no lawyer. Right now there's not a lawyer here with you. You don't have a lawyer. But, if you want to wait, I want to know right now. Because I want to talk to you right now. And right now you don't have. We need to be very clear here.

[Appellant:] Then, let's do it without a lawyer.

[Marin:] Pardon me?

[Appellant:] Let's talk without a lawyer.

[Marin:] Without a lawyer?

9

[Appellant:] Yes. [NVA]

[Marin:] OK. Because you have the right, you, you asked me: "Well, I don't have a lawyer." Then I'm tellin' you, the court will point it a free lawyer for ya if no, if you don't have . . . if you're very poor. It says here, right?

[Appellant:] Uh-huh.

[Marin:] But I want, I want to be very clear that you want to talk to me. And uh, uh, talk to me about this case without your lawyer.

[Appellant:] [NVA]

[Marin:] But I need to say, if you want to wait, it's, it's your right, like it says here.

[Appellant:] Nah.

[Marin:] OK. We need to be very clear here. What do you want to do?

[Appellant:] Let's talk without a lawyer.

Appellant urges that he unambiguously invoked his right to counsel during questioning when he said, "I don't want to give up the service of the lawyer," and again when he asked, "And is there a lawyer [here] right now?" But when these statements are considered in the context of all that was said by both appellant and Marin, we agree with the trial court's conclusion that appellant did not clearly invoke his right to counsel during questioning. To the contrary, the record as a whole shows that appellant knowingly waived that right with the understanding that he retained his right to appointed counsel at trial. No *Edwards* violation is shown.

Appellant's contention that his oral statement to the police was inadmissible and should have been suppressed is overruled.

10

*Demonstration*

There was evidence that appellant struck CM with a looped electrical cord. During her testimony, Detective Jeri Skrocki, one of the investigating officers and a certified police instructor in family violence and child abuse cases, conducted a demonstration in which she struck a table in the courtroom with an electrical cord found in appellant's residence. The record reflects that Skrocki took the cord and looped it "very similar to what we saw in the pictures of [CM's] back." She then demonstrated as follows:

> Basically, what I do when I instruct officers is I'll pick up an object . . . . Oftentimes it's an extension cord or something like that. And then I'll explain to them if I hit somebody, I can hit (indicating)—that's not using a whole lot of force, as you-all saw. I barely even hit. That's going to leave a big sting.
>
> If you have somebody who's angered, in a frenzy, and you take a little bit more of a strike to it (indicating), that's going to give you a whole lot more. And just by virtue of the sound, you can hear the difference between the impacts of what you're seeing.
>
> The same, of course, would be true if you're—if you're using this (indicating). You've got that (indicating). It's a big difference.

Appellant contends that the trial court erred by permitting this demonstration over his timely objection. He urges that the demonstration was unfairly prejudicial and that the prejudice outweighed any probative value the demonstration might have had. *See* Tex. R. Evid. 403. We review the trial court's ruling for an abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). We consider the probative value of the evidence, the potential to impress the jury in some irrational but indelible way, the time needed to develop the

11

evidence, and the proponent's need for the evidence. *Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004).

The State had little need for Skrocki's demonstration, which in itself had minimal probative value. Several medical witnesses described the looped lesions, and the State introduced a number of photographs showing the looped marks of varying ages on CM's body. This evidence was far more probative of the nature of appellant's abusive conduct than the officer's hitting the table with the electrical cord. Moreover, it did not require a demonstration for the jury to understand that if a person strikes a child with a looped electrical cord, the child is likely to be injured, and that the degree of injury will increase the harder the child is hit.

But if the trial court abused its discretion by permitting the demonstration, the error did not affect appellant's substantial rights under the circumstances of this case. *See* Tex. R. App. P. 44.2(b). Appellant admitted biting and striking his children. The State introduced dozens of photographs showing that the complainants' bodies were literally covered with scars and lesions. In addition to seeing the photographs depicting the complainants' external injuries, the jury heard medical testimony describing the complainants' many broken bones, the complainants' malnutrition, and the adverse physiological and psychological consequences, some of them permanent, suffered by the complainants as a result of their abuse at appellant's hand. We find no subsequent mention of the demonstration during the arguments of counsel. We are satisfied that the relatively brief demonstration by the officer did not significantly contribute to either the finding of guilt or the punishment. No reversible error is presented.

*Hospital Records*

During her testimony, Skrocki was asked if the use of a looped electrical cord to hit CM was consistent with the medical findings. Appellant objected that this was a matter outside of the witness's knowledge. The objection was sustained. The prosecutor then established through a series of questions that, in the course of her investigation, the officer reviewed the medical records and conferred with the doctors and nurses. Following this, the prosecutor again asked Skrocki if "those marks [were] consistent with the medical findings of Brackenridge Hospital." Appellant objected that the question called for hearsay. After receiving the prosecutor's assurance that "someone from Brackenridge" was going to testify, the objection was overruled. Skrocki testified that the use of an electrical cord was consistent with the medical findings.

Appellant now contends that trial court erroneously permitted the introduction of the hospital records through Skrocki without the proper predicate. This is not the objection appellant made at trial, nor is it what happened at trial. The hospital records were admitted in evidence later in the trial after the proper predicate was laid and without objection by appellant. In addition, one of the examining physicians testified without objection that CM "had patterned bruising that appeared to have been caused by some kind of looped cord or whip or some kind of object." No error is presented.

*Mistrial*

Finally, appellant asserts that the trial court should have granted his motion for mistrial after a State witness gave an interview to the press. Alternatively, appellant urges that the court should have granted his motion to strike the witness's testimony.

The witness was Stefan Bjes, an Addison, Illinois, police officer, who testified at the punishment stage regarding appellant's involvement in gang-related criminal activities in that city. At the conclusion of his testimony, the officer was released to return to Illinois. The court told him, "I don't think you're going to be seeing anybody to discuss your testimony with, so we don't have to explain the witness rule to you." The prosecutor then indicated to the court that the rule had been explained to the officer.

When trial resumed the next day, appellant moved for a mistrial complaining that as Bjes left the courthouse, he gave an interview that had been broadcast on television in which he stated that appellant was a violent gang member. The court replied, "That was his testimony, I think, wasn't it?" Counsel did not deny this, but said, "The fact is the witnesses have been instructed not to speak with anyone. He could have had an influence on all other witnesses." The court corrected counsel, "No. They have been instructed not to . . . the witness rule does not include the press that I'm aware of. They're not to talk to other witnesses. And the witnesses are not supposed to be watching—I don't know what—go ahead and finish your objection." Counsel then moved for a mistrial "on grounds of prosecution misconduct." The motion was denied. Counsel asked that Bjes's testimony be stricken from the record. This was also denied.

Appellant asserts that the prosecutors "were under a duty as officers of the Court to instruct their witnesses to avert their comments from the press. The State however breached this duty . . . ." There is no support for this assertion in the record. The record does reflect that appellant's trial attracted a good deal of media attention, and the trial court repeatedly admonished

14

the jurors to avoid all news accounts of the trial. However, there was and is no evidence that any other witness or any juror saw or heard Bjes's televised statements.

Mistrial is a remedy appropriate for a narrow class of highly prejudicial and incurable errors. *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000). Whatever the propriety of Bjes's decision to speak to the press following his testimony, appellant's motion for mistrial was not supported by any showing of prejudice, much less incurable prejudice, arising out of the officer's conduct. The trial court did not abuse its discretion by overruling the motion for mistrial or by refusing to order Bjes's testimony stricken from the record.

The judgments of conviction are affirmed.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed: July 8, 2009

Do Not Publish